### IN THE UNITED STATES DISTRICT COURT
### FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| GRACE E. B.,[1] | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )    Case No. 19-cv-1136-MAB[2] |
| | ) |
| COMMISSIONER of SOCIAL | ) |
| SECURITY, | ) |
| | ) |
| Defendant. | ) |

### MEMORANDUM AND ORDER

**BEATTY, Magistrate Judge:**

In accordance with 42 U.S.C. § 405(g), Plaintiff, represented by counsel, seeks judicial review of the final agency decision denying her application for Disability Insurance Benefits (DIB) and Supplemental Income Security (SSI) benefits pursuant to 42 U.S.C. § 423.

### PROCEDURAL HISTORY

Plaintiff applied for disability benefits in May 2016, alleging disability as of January 1, 2011. After holding an evidentiary hearing, an ALJ denied the application on December 20, 2018. (Tr. 13-20). The Appeals Council denied review, and the decision of the ALJ became the final agency decision. (Tr. 1). Administrative remedies have been

---

[1] In keeping with the court's practice, Plaintiff's full name will not be used in this Memorandum and Order due to privacy concerns. See, Fed. R. Civ. P. 5.2(c) and the Advisory Committee Notes thereto.

[2] This case was assigned to the undersigned for final disposition upon consent of the parties pursuant to 28 U.S.C. §636(c). See, Docs. 12 & 18.

exhausted and a timely complaint was filed in this Court.

<u>ISSUES RAISED BY PLAINTIFF</u>

Plaintiff raises the following points:

1. The ALJ failed to properly evaluate Listing 11.09.

2. The ALJ failed to properly evaluate the RFC.

<u>APPLICABLE LEGAL STANDARDS</u>

To qualify for DIB or SSI, a claimant must be disabled within the meaning of the applicable statutes. Under the Social Security Act, a person is disabled if she has an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(a).

To determine whether a plaintiff is disabled, the ALJ considers the following five questions in order: (1) Is the plaintiff presently unemployed? (2) Does the plaintiff have a severe impairment? (3) Does the impairment meet or medically equal one of a list of specific impairments enumerated in the regulations? (4) Is the plaintiff unable to perform her former occupation? and (5) Is the plaintiff unable to perform any other work? 20 C.F.R. § 404.1520.

An affirmative answer at either step three or step five leads to a finding that the plaintiff is disabled. A negative answer at any step, other than at step three, precludes a finding of disability. The plaintiff bears the burden of proof at steps one through four.

Once the plaintiff shows an inability to perform past work, the burden then shifts to the Commissioner to show that there are jobs existing in significant numbers in the national economy which the plaintiff can perform. *Zurawski v. Halter*, 245 F.3d 881, 886 (7th Cir. 2001).

It is important to recognize that the scope of review is limited. "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive. . . ." 42 U.S.C. § 405(g). Thus, this Court must determine not whether Plaintiff was, in fact, disabled at the relevant time, but whether the ALJ's findings were supported by substantial evidence and whether any errors of law were made. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). The Supreme Court defines substantial evidence as, "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (internal citations omitted).

In reviewing for "substantial evidence," the entire administrative record is taken into consideration, but this Court does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute its own judgment for that of the ALJ. *Burmester v. Berryhill*, 920 F.3d 507, 510 (7th Cir. 2019). However, while judicial review is deferential, it is not abject; this Court does not act as a rubber stamp for the Commissioner. *See, Parker v. Astrue*, 597 F.3d 920, 921 (7th Cir. 2010), and cases cited therein.

## THE DECISION OF THE ALJ

The ALJ followed the five-step analytical framework described above. He

determined that Plaintiff engaged in substantial gainful activity from January 1, 2011 to June 2, 2016. The ALJ determined there was a continuous 12-month period during which Plaintiff did not engage in substantial gainful activity. She is insured for DIB through December 31, 2022.

The ALJ found that Plaintiff had severe impairments of asthma; multiple sclerosis (MS); and obesity.

The ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

The ALJ found that Plaintiff had the residual functional capacity (RFC) to "perform light work…except: lift and carry 20 pounds occasionally and 10 pounds frequently; stand/walk 6 hours in an 8-hour day; sit 6 hours in an 8-hour day; no operation of foot controls; occasionally climb ramps and stairs; never climb ladders, ropes, or scaffolds; must avoid exposure to hazards, odors, dust, fumes, poor ventilation, and pulmonary irritants."

Based on the testimony of a vocational expert, the ALJ concluded that Plaintiff is able to perform past relevant work as a preschool teacher and security guard. The ALJ did not evaluate Step 5.

## THE EVIDENTIARY RECORD

The Court reviewed and considered the entire evidentiary record in preparing this Memorandum and Order. The following summary of the record is directed to Plaintiff's

arguments.

### 1.    Agency Forms

Plaintiff was born in 1984 and was 34 years old on the date of the ALJ's decision. (Tr. 200). Plaintiff said she stopped working in June 2016 because of her conditions. She previously worked as a security guard from 2005 to 2013 and a preschool teacher from 2013 to 2016. (Tr. 219-20).

In a Function Report submitted in December 2015, Plaintiff said it hurts to walk, stand, sit or bend for too long, and lifting more than ten pounds causes pain. Plaintiff said her symptoms affect her ability to do housework and personal care, such as dressing, bathing, and grooming. (Tr. 227-29). Plaintiff said her symptoms affect her lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, stair climbing, and task completion. Plaintiff said she can only walk ten to fifteen minutes before needing to rest for thirty to forty minutes. Plaintiff said her condition affects her memory. Plaintiff said she was prescribed crutches in 2007 to use for support when in pain. (Tr. 232-33).

### 2.    Evidentiary Hearing

Plaintiff was represented by an attorney at the evidentiary hearing in August 2018. (Tr. 28).

Plaintiff said she stopped working as a preschool teacher in January 2018. She said she had to miss work a lot due to her health, and that was part of the reason she was let go. Plaintiff called off work anywhere from three to five days a month at minimum to ten to fifteen days a month at maximum due to her MS flare-ups. Plaintiff said missing a day

of MS medication causes flare-ups. (Tr. 31-34). Plaintiff said she has decreased feeling in her legs, feet and hands, and that causes her to fall and trip. (Tr. 34-35, 37). When asked how many flare-ups she would have while taking medication as prescribed, Plaintiff said she would have a week-long flare-up in a month. Plaintiff testified to having issues with doing housework and will sometimes get help from her mother with laundry and going down steps. Plaintiff said her medications cause drowsiness and diarrhea. Plaintiff said she does not like to go grocery shopping because it involves too much walking. (Tr. 36-39). Plaintiff testified to having memory issues caused by her MS diagnosis, so she needs reminders at times. (Tr. 46).

A vocational expert (VE) testified at the hearing. The ALJ presented hypotheticals to the VE which corresponded to the ultimate RFC findings, and the VE testified that a person with Plaintiff's RFC could perform their past work of being a security guard and preschool teacher. The ALJ asked the VE if an individual who had to miss more than two days of work per month could maintain employment, and the VE said it would eliminate past work and any other work. (Tr. 50-51).

### 3.   Relevant Medical Records

Plaintiff presented to Barnes Jewish Hospital's emergency department five times between November 2011 and September 2016 reporting bilateral leg pain and burning; numbness; back pain; focal sensory changes; weakness; unbalanced gait; pins in her lower mid back; running out of pain medications; and no relief from Tramadol. (Tr. 312, 350, 352-53, 389, 834, 903, 967, 1081). Some physical examinations revealed normalcy,

while others revealed a tender neck; tender bilateral calves; and muscle spasms. (Tr. 354, 389-90, 834, 903, 1023). Diagnoses and assessments included numbness; MS flare; musculoskeletal pain; low back pain; and muscle spasms. (Tr. 336, 390, 904, 957). Plans included medications, MRIs, bloodwork, and a neurology referral. (Tr. 390, 937). Plaintiff was given work notes limiting her to working with restrictions, such as avoiding prolonged standing and walking, lifting no more than ten pounds, and light duty work. (Tr. 336, 905, 924, 957). Two of the emergency physicians that Plaintiff saw said her pain was likely not MS-related nor a result of an MS exacerbation. (Tr. 904, 1062).

Plaintiff underwent an MRI of her brain, cervical spine, lumbar spine, and thoracic spine on November 21, 2011, and the impression was, "1. New foci of T2 hyperintensity in the anterior corpus callosum[3] and right corona radiata[4] without enhancement. Additional lesions in the bilateral cerebral white matter and focus of subtle T2 hyperintensity at the T10-T11 level is unchanged since the prior. These lesions are consistent with chronic demyelination[5]." (Tr. 824, 826, 828, 830).

Plaintiff presented to Touchette Regional Hospital's emergency department eight times between April 2012 and August 2018. (Tr. 571, 583, 603, 695, 751, 779, 1111, 1451).

---

[3] Corpus callosum refers to, "The arched bridge of nervous tissue that connects the two cerebral hemispheres, allowing communication between the right and left sides of the brain." https://medical-dictionary.thefreedictionary.com/corpus+callosum, visited on August 17, 2020.

[4] Corona radiata refers to, "A fan-shaped fiber mass on the white matter of the cerebral cortex, composed of the widely radiating fibers of the internal capsule." https://medical-dictionary.thefreedictionary.com/corona+radiata, visited on August 17, 2020.

[5] Demyelination refers to, "destruction, removal, or loss of the myelin sheath of a nerve or nerves." https://medical-dictionary.thefreedictionary.com/demyelination, visited on August 17, 2020.

Plaintiff reported MS flare-ups; lethargy possibly due to medications; right side numbness; right wrist pain; one month of intermittent right forearm pain without injury; dizziness and vertigo; needing pain medications; needing a work note; leg, neck, and back pain; tingling; weakness; and the Tramadol was ineffective. (Tr. 571, 583, 603, 608, 695, 722, 755, 757, 779, 1111, 1122-23, 1451). The physical examinations revealed normality, and others revealed Plaintiff was somnolent; had a painful upper right extremity; had grossly intact motor, sensory and coordination; had back tenderness and decreased range of motion; had muscle spasms; had vertebral point tenderness; and had cerebrovascular tenderness. (Tr. 571, 608, 725-28, 761, 785, 1128). Impressions included lethargy, MS, medication side effects, and back pain. (Tr. 572, 609, 1132). Plans and recommendations included medication management, a neurology follow-up, an orthopedic referral, lab work, and physical therapy. (Tr. 571, 617, 731, 764, 789, 1131).

The impression of a wrist x-ray taken on December 29, 2013, was, "1. NO ACUTE ABNORMALITY DEMONSTRATED." (Tr. 605).

Plaintiff underwent a brain MRI on January 30, 2014. The impression was, "[a]t least 20 to 25, including at least 5 new T2/FLAIR hyperintensities with one enhancing lesion consistent with progression of multiple sclerosis." (Tr. 378-79).

Plaintiff underwent a brain MRI on August 27, 2015, and the impression was, "NORMAL BRAIN FOR AGE." (Tr. 517).

Plaintiff presented to Miguel Granger, a family medicine doctor, on April 15, 2016, complaining of multiple sclerosis. Plaintiff reported an MS flare-up. Plans included

medication and a neurology follow-up. (Tr. 463).

Plaintiff presented to Jawad Khan, a family medicine doctor, on April 29, 2016, reporting an MS flare-up. The assessment included MS and paresthesia, and plans included medication; blood testing; and a work statement saying Plaintiff was not to lift, push, or pull more than ten pounds. (Tr. 301).

Plaintiff presented to Dr. Khan on May 9, 2016, for lab results. Plaintiff started Tecfidera and Tramadol. (Tr. 302).

Plaintiff underwent a brain and cervical spine MRI on May 21, 2016. (Tr. 372, 375). The impression was, "Multiple punctate/ovoid white matter T2 hyperintensities consistent with the patient's known history of multiple sclerosis. There is decreased T2 signal with resolution of enhancement involving lesion in the right cerebellum. New focus of enhancement is present in the left peritrigonal white matter. Otherwise, T1/FLAIR hyperintense lesions are stable in size and number. No evidence of cervical spine lesion." (Tr. 373, 376).

Plaintiff presented to Heather Lucas-Foster, a family medicine physician, on May 25, 2016, reporting work restrictions due to MS. (Tr. 470).

Plaintiff presented to Vittal Chapa, a state agency medical consultant, for a consultative examination on September 22, 2016. Plaintiff reported being diagnosed with MS in 2007; problems with walking; burning sensations in her skin; numbness in her legs; and having eight MS flare-ups a year. (Tr. 1105). A physical examination came back normal. The diagnoses included MS. (Tr. 1107).

Plaintiff underwent an x-ray of her lumbar spine on November 7, 2016, and the impression was, "1. NO ACUTE OSSEOUS ABNORMALITIES. 2. SCOLIOSIS OF THE THORACIC SPINE PARTIALLY VISUALIZED." (Tr. 1118).

Plaintiff presented to Erik Musiek, a neurologist, on January 24, 2017, reporting MS, worsening back pain, memory problems, more paresthesia over her face and legs, urinary problems, fatigue, numbness, weakness, and pain. A physical exam revealed decreased bilateral finger taps and mild vibration and pinprick loss in the lower extremities. Dr. Musiek said Plaintiff's memory problem and unspecific symptoms of fatigue are most likely due to her untreated depression as opposed to MS. Plans included medications. (Tr. 1240-43).

Plaintiff presented to Memorial Hospital's emergency department on May 27, 2017, complaining of neck pain. (Tr. 1143). Plaintiff underwent a cervical spine x-ray, and the impression was, "No acute osseous abnormality with early osteoarthritic changes." (Tr. 1156).

Plaintiff presented to Memorial Hospital's emergency department on May 31, 2017, complaining of acute neck pain and degeneration of the intervertebral disc of the cervical region. Plans included using an ice pack, considering chiropractic care or massage therapy, doing gentle stretches, using Bio Freeze, considering NSAIDS, and scheduling a physical therapy appointment. (Tr. 1158).

Plaintiff underwent an MRI on June 17, 2017. The impression was, "1. Multiple intracranial and spinal white matter lesions compatible with multiple sclerosis. 2. New

T2 Lesions: Two, one adjacent to left ventricular frontal horn and one in the left corona radiata. 3. Enhancing Lesions: One in left corona radiata. 4. No demyelinating lesions in the cervical spine. 5. Other significant findings: mild cerebellar ectopia." [6] (Tr. 1268).

Plaintiff presented to Elie Ghoulam, a SLUCare physician, on July 13, 2017, complaining of dissatisfaction with her primary care physician's management of pain control and MS flare-ups every four months where she feels flushed and loses sensation in her legs which causes her to fall. (Tr. 1246, 1248). A physical exam revealed normalcy. (Tr. 1249). The assessment included MS, and plans included medications. (Tr. 1247).

Plaintiff called SLUCare Medical Group on August 4, 2017, saying her ability to work decreased due to the pain she experienced. (Tr. 1259).

Plaintiff presented to Francis Wade III, an internist, on October 19, 2017, complaining of back pain and to fill out paperwork regarding her ability to work. (Tr. 1256). Plaintiff reported missing twenty-five days of work since January 2017 due to pain. (Tr. 1268). A physical exam revealed no joint tenderness on palpation and 5/5 sensation in her bilateral upper and lower extremities. Plans included working as a substitute teacher as Plaintiff believed she could perform that job. (Tr. 1266-67).

Plaintiff presented to Memorial Hospital's emergency department on January 25, 2018, complaining of a fall that caused a concussion and blunt head trauma. Plaintiff was told to use Tylenol for pain; apply ice for swelling; and follow up with her primary care

---

[6] Ectopia refers to, "Congenital displacement or malposition of any organ or part of the body." https://medical-dictionary.thefreedictionary.com/ectopia, visited on August 17, 2020.

provider. (Tr. 1170).

Plaintiff spoke to Veronica Martinez, a registered nurse, on February 23, 2018, reporting baseline numbness and weakness to her bilateral lower extremities due to MS and increased pain that started a few weeks prior. Plaintiff said her MS doctor no longer took Medicare so she needed a new referral. (Tr. 1310-11). A physical exam revealed no joint tenderness to palpation and no focal neurologic deficits. Plans included medications, a neurology referral, a pain clinic referral, finding a physical therapist that Plaintiff's insurance covered, and a primary care physician appointment. (Tr. 1319).

Plaintiff presented to Aunita Hill-Jones, an internist, on February 26, 2018, reporting back pain related to her MS since several weeks prior; taking Tramadol more often than prescribed to deal with the pain; and numbness and tingling in her bilateral arms and legs. (Tr. 1317-18, 1321). A physical exam revealed 5/5 bilateral strength in the upper and lower extremities; no focal neurologic deficits; and no tenderness. The assessment included medications. (Tr. 1321).

Plaintiff presented to Dr. Ghoulam on March 22, 2018, for a follow-up. A physical exam revealed no cervical tenderness; 4/5 strength in bilateral upper and lower extremities; no focal neurologic deficits; and grossly intact sensation. The assessment included chronic pain secondary to MS, and plans included medications and finding a neurologist. (Tr. 1377-79).

Plaintiff presented to Alex Loveleena, a family medicine nurse practitioner, on May 14, 2018, reporting unimproved MS symptoms while using Tecfidera, numbness,

and chronic low back pain. A physical exam revealed normal ambulation, normal movement of all extremities, and a normal gait. The assessment included MS and chronic low back pain, and plans included medications, an x-ray, and a physical therapy referral. (Tr. 1233-35). Plaintiff underwent a lumbar spine x-ray, and the impression was, "Scoliotic curvature of the spine with congenital near complete fusion of the lower thoracic spine with vertebral body segmentation anomaly T10." (Tr. 1446).

Plaintiff presented to physical therapy seven times in June 2018 to address abnormal posture, general weakness, MS, and a history of falling. (Tr. 1449, 1462-63, 1465-68).

Plaintiff presented to NP Loveleena on June 5, 2018, reporting an inability to exercise because of her MS; muscle aches; joint pain; and back pain. A physical exam revealed normal movement of all extremities, low back tenderness, and a normal gait. The assessment included MS, and plans included medications and a neurology referral. (Tr. 1433).

Plaintiff presented to Cynthia Riewski, a licensed clinical social worker, on July 11, 2018, reporting anxiety and depression partially due to MS complications. Plaintiff reported an inability to work because of falling and frequently pain, and she said she felt like she is experiencing a slow death with MS. (Tr. 1426-28).

### 4.    Dr. Charles Kenney's Opinion

Dr. Kenney, a State agency medical consultant, noted Plaintiff could occasionally lift and/or carry twenty pounds;  frequently lift and/or carry ten pounds; stand and/or

walk for about six hours in an eight-hour workday; sit for about six hours in an eight-hour workday; and push and/or pull with lower extremity limitations. (Tr. 76). Dr. Kenney stated, "[w]hen she has flare of the BLE she experiences loss of balance and burning of BLE…CE with Dr. Chapa is [within normal limits] but documented flares with disorganization of motor function…Risk of harm related to BLE disorganization of function during flares." (Tr. 77).

<u>ANALYSIS</u>

First, Plaintiff asserts the ALJ failed to properly evaluate Listing 11.09. The ALJ said Plaintiff should have alleged that her impairments met or equaled the requirements of Listing 11.09, but Plaintiff argues that the ALJ has an independent duty to apply the relevant law, irrespective of Plaintiff's knowledge of it.

A finding that a claimant's condition meets or equals a listed impairment is a finding that the claimant is presumptively disabled. The Listings are found at 20 C.F.R. Pt. 404, Subpt. P, App. 1. In order to be found presumptively disabled, the claimant must meet all of the criteria in the Listing; an impairment "cannot meet the criteria of a listing based only on a diagnosis." 20 C.F.R. §404.1525(d). The claimant bears the burden of proving that she meets or equals a listed impairment. *Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012); *Maggard v. Apfel*, 167 F.3d 376, 380 (7th Cir. 1999). An ALJ's failure to discuss a Listing does not warrant remand unless the Plaintiff demonstrates that she meets the Listing. *See Jeske v. Saul*, 955 F.3d 583 (7th Cir. 2020).

The 11.00 series of the Listings covers neurological disorders. As is relevant here,

Listing 11.09 includes:

> 11.09 *Multiple sclerosis*, characterized by A or B:
> A. Disorganization of motor function in two extremities (see 11.00D1), resulting in an extreme limitation (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities; or
> B. Marked limitation (see 11.00G2) in physical functioning (see 11.00G3a), and in one of the following:
> 1. Understanding, remembering, or applying information (see 11.00G3b(i)); or
> 2. Interacting with others (see 11.00G3b(ii)); or
> 3. Concentrating, persisting, or maintaining pace (see 11.00G3b(iii)); or
> 4. Adapting or managing oneself (see 11.00G3b(iv)).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

Plaintiff is incorrect in suggesting the ALJ has an independent duty to apply the relevant law regarding a Listing whether or not Plaintiff suggests she meets that Listing. Plaintiff bears the burden of proving if her impairments meet or equal a listed impairment. *Filus*, 694 F.3d at 868. Plaintiff failed to do so here. Even if Plaintiff's argument was correct, the ALJ sufficiently engaged with the evidence and minimally articulated himself as to whether Plaintiff met the Listing requirements.

The Seventh Circuit has "repeatedly held that although an ALJ does not need to discuss every piece of evidence in the record, the ALJ may not analyze only the evidence supporting her ultimate conclusion while ignoring the evidence that undermines it." *Moore v. Colvin*, 743 F.3d 1118, 1123 (7th Cir. 2014). Moreover, the ALJ must "engage sufficiently" with the medical evidence. *Stage v. Colvin*, 812 F.3d 1121, 1125 (7th Cir. 2016). The ALJ "need not provide a complete written evaluation of every piece of testimony and

evidence." *Curvin v. Colvin*, 778 F.3d 645, 651 (7th Cir. 2015) (citation and internal quotations omitted). However, the ALJ's discussion of the evidence must be sufficient to "provide a 'logical bridge' between the evidence and his conclusions." *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009)(internal citations omitted).

At Step 3, the ALJ said that Plaintiff did not meet the requirements of Listing 11.09 because "no treating or examining physician has documented findings equivalent in severity to the criteria of any listed impairment, nor does the evidence show medical findings that are the same or equivalent to those of any listed impairment…" (Tr. 17). The ALJ also noted that Plaintiff did not allege that her impairments met or equaled a Listing. (Tr. 17).

At Step 4, the ALJ furthered his discussion of the record evidence from Tr. 17 to Tr. 19. The ALJ noted Plaintiff's subjective allegations of her MS flares. The ALJ acknowledged Plaintiff's statements that the flare-ups happen up to one week out of the month and cause numbness in her feet, legs, and hands. The ALJ also acknowledged that Plaintiff said her MS causes trips and falls a couple times a month, memory problems, and depression. (Tr. 17). The ALJ continued on at Tr. 18 and Tr. 19, noting further subjective statements made by Plaintiff; MRI results that are consistent with MS; medical opinions; physical examination results both normal and abnormal; and Plaintiff's insurance and medication history. Therefore, Plaintiff's argument fails.

Plaintiff relies on Dr. Kenney's medical opinion in which he said Plaintiff suffers from "disorganization of motor function," and she suggests that this further satisfies the

Listing requirement. (Tr. 77). Plaintiff's arguments are comprised of a host of misunderstandings. This Court agrees with Defendant that Plaintiff's argument ignores the context in which Dr. Kenney gave his opinion. Dr. Kenney's statement does not establish that Plaintiff has the degree of disorganization as required by the Listing. Dr. Kenney stated Plaintiff's flare-ups cause disorganization of motor function yet went on to suggest that Plaintiff could do light work. This does not indicate Dr. Kenney believed Plaintiff is disabled. Dr. Kenney is a state agency consultant, and those individuals are familiar with the Listings. With that said, Dr. Kenney would not have rated Plaintiff as able to do light work if he thought she met a Listing.

Plaintiff suggests that more analysis from a medical professional and the ALJ as to whether Plaintiff meets or equals Listing 11.09 is required since Dr. Kenney did not document whether he evaluated any Listings. For the reasons set forth above, Plaintiff is incorrect.

For her second issue, Plaintiff argues the ALJ failed to properly evaluate RFC. Plaintiff goes on to suggest that the RFC was wrong because it was based off Dr. Kenney's medical opinion. Plaintiff also argues the ALJ failed to evaluate the duration and frequency of Plaintiff's MS flare-ups. However, for the reasons set forth above, these arguments fail.

Lastly, Plaintiff points to the VE testimony arguing that the ALJ failed to determine whether Plaintiff would miss work on a consistent-enough basis that would prevent her from sustaining employment.

At the evidentiary hearing, the ALJ asked the VE if an individual who had to miss more than two days of work per month could maintain employment, and the VE said it would eliminate past work and any other work. (Tr. 50). Plaintiff's attorney asked the VE what an employer would tolerate if an individual was off task due to deprived sleep, medication side effects, or symptoms of their impairments. The VE said usually employers only tolerate off-task behavior that happens less than ten percent of the time, but it varies by employer. (Tr. 51).

Being off-task due to medications, symptoms, and other things secondary to impairments can impact whether a person would be able to work a full eight-hour workday. Also, it is true that there were some objective medical records in which medical professionals commented on Plaintiff's MS impairment and symptoms. However, the ALJ addressed Plaintiff's MS impairment including both the objective and subjective evidence. The ALJ explained at Tr. 17 and 18 that "the claimant's statements concerning the intensity, persistence and limiting effects of those symptoms are not entirely consistent with the medical evidence and other evidence in the record," and continued in explaining his reasoning as mentioned above in Plaintiff's first issue. Additionally, the ALJ noted that Dr. Musiek found no indication of memory problems at Tr. 18.

The crux of Plaintiff's argument involves her subjective statements as opposed to objective findings. This, in combination with the ALJ's decision and the VE testimony that Plaintiff is able perform her past work, further exacerbates Plaintiff's failure to carry her burden of showing that she is unable to do her past work. Therefore, Plaintiff's

argument fails.

Plaintiff's arguments are little more than an invitation for this Court to reweigh the evidence. She has not identified a sufficient reason to overturn the ALJ's conclusion. Even if reasonable minds could differ as to whether Plaintiff was disabled at the relevant time, the ALJ's decision must be affirmed if it is supported by substantial evidence, and the Court cannot substitute its judgment for that of the ALJ in reviewing for substantial evidence. *Burmester*, 920 F.3d at 510; *Shideler v. Astrue*, 688 F.3d 306, 310 (7th Cir. 2012).

## CONCLUSION

After careful review of the record as a whole, the Court is convinced that the ALJ committed no errors of law, and that his findings are supported by substantial evidence. Accordingly, the final decision of the Commissioner of Social Security denying Plaintiff's application for disability benefits is **AFFIRMED**.

The Clerk of Court is directed to enter judgment in favor of Defendant.

**IT IS SO ORDERED.**

**DATED: August 17, 2020**

> **/s/ Mark A. Beatty**
> **MARK A. BEATTY**
> **United States Magistrate Judge**